UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X

Doris FEBO,

                                        Plaintiff,

                    -against-

COMMISSIONER OF SOCIAL SECURITY,

                                        Defendant.

-----------------------------------------------------------------X

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED:__   9/4/2013
```

12-CV-8085 (PAC)(SN)

**REPORT AND
RECOMMENDATION**

**SARAH NETBURN, United States Magistrate Judge.**

**TO THE HONORABLE PAUL A. CROTTY:**

Plaintiff Doris Febo brings this action pursuant to 42 U.S.C. § 405(g) and 42 U.S.C.

§ 1383(c), seeking judicial review of a final decision of the Commissioner of Social Security (the

"Commissioner") denying her application for disability insurance and Supplemental Security

Insurance ("SSI") benefits. Febo moved for judgment on the pleadings pursuant to Rule 12(c) of

the Federal Rules of Civil Procedure and, in the alternative, requested remand to the

Commissioner for further proceedings. (Docket No. 11.) The Commissioner cross-moved for

judgment on the pleadings pursuant to Rule 12(c). (Docket No. 14.)

Because the ALJ misapplied the treating physician rule, I recommend that the

Commissioner's motion for judgment on the pleadings be DENIED. I further recommend that

the plaintiff's motion to remand to the Commissioner for proper application of the treating

physician rule be GRANTED.

## PROCEDURAL BACKGROUND

Doris Febo applied to the Social Security Administration ("SSA") on June 11, 2010,

filing concurrent applications for Social Security benefits ("SSD") and Supplemental Security

Income benefits ("SSI"). She alleged disability since April 4, 2009. Febo's claims were denied, and she requested an administrative hearing on September 2, 2010.

On September 8, 2011, a hearing was held before Administrative Law Judge ("ALJ") Curtis Axelsen. On October 17, 2011, the ALJ found that Febo was not disabled within the meaning of the Social Security Act (the "Act"). On October 28, 2011, Febo requested review of the ALJ's decision by the Appeals Council. On September 17, 2012, the Appeals Council denied the request, making the ALJ decision final and reviewable by this Court under 42 U.S.C. § 405(g) and § 1383(c)(3).

## FACTUAL BACKGROUND

### I.    Non-Medical and Testimonial Evidence

Febo was born in 1963 in Puerto Rico. She speaks English fluently and finished her GED in 1993.

In 2005, Febo was diagnosed with bi-polar disorder and depression. She was "in denial" for several years and "was on and off [her] meds." (R. 36.) Since 2010, she has seen Dr. Andrea Clair, a psychiatrist, regularly, and also goes to counseling once a week to address other issues, including stress management. She has struggled with alcohol and, at the time of the SSA hearing, she had been sober for over seven months. She describes her condition as a "roller coaster." (R. 37.) She sleeps with the help of Buspar, a drug that addresses anxiety.

Febo worked consistently from 1996 until 2008, while she lived in Orlando, Florida. She worked full-time as a cashier at a bakery from 2000 to 2002; as an office assistant at an insurance company from 1996 to 2000; as a stocker at a battery company from 2002 to 2005; as a shipping and receiving data operator for Air Train Airways from 2005 to 2008. (R. 121, 136-41.) Febo stopped working in July 2008 when she was fired for frequent absences, which, she testified, was

due to not "want[ing] to get out of bed." (R. 34-35, 120.) She estimates that in her last month of work she was absent "at least ten days." (R. 35.)

In April 2010, Febo moved to New York to "start over" and be with her family. (R. 35.) In March 2011, she applied for a job but was not hired. She now describes her lack of concentration and forgetfulness as one of the main barriers to her obtaining employment. She commented at the hearing that, if she had a full-time job, she "probably wouldn't show up most of the time." (R. 43.)

Febo does not live alone; instead, she stays with her mother or her sister. She spends her days attending her individual counseling and group therapy, watching television and listening to the radio. Her concentration difficulties prohibit her from watching television for a full hour. She does not read.

Febo rarely socializes outside her family, as she is "afraid to make friends." (R. 38.) She comments, "I mostly spend time only with family members and people in my program. I rarely spend time with friends." (R. 133.) She sees her family every day. She does not have any hobbies, noting that "[s]ince my conditions started I have lost interest in most activities." (R. 132.) Although she does not prepare her own meals or do household chores, she helps her family members with laundry. She shops for food every other day but has trouble saving money or budgeting.

Febo prefers not to travel alone; when using public transportation, her sister frequently accompanies her. When alone, she suffers from anxiety on the train and bus.

## II.      Medical Evidence

Febo has been diagnosed with depression, anxiety, bi-polar disorder, and personality disorder. Her allegations of depression extend back to 2008 in Florida when she first received medical attention for bi-polar disorder and alcohol abuse.

From 2008 to 2010, Febo was in psychiatric and drug treatment at the Seminole County Mental Health Center in Florida. In 2010, she moved to New York. When she first arrived, she was seen by the Federation Employment and Guidance Services ("FEGS") and also evaluated by State Psychiatric Physicians. She began regular treatment with Dr. Clair at the Center for Comprehensive Health Practice in June 2010. According to the record, Febo was still seeing Dr. Clair on at least a semi-monthly basis in March 2012.

### A.  Seminole County Mental Health Center Records

Febo was admitted to the Seminole County Mental Health Center in Florida in August 2008. She met with a nurse practitioner, Debra Hargrove, on August 8, 2008 who conducted a psychiatric evaluation. Nurse Hargrove continued to meet with Febo through February 2010.

The records from this time period reveal a history of bi-polar disorder and alcohol abuse, as well as a remote history of drug abuse. Febo reported that she had recently lost her job and insurance due to her mental health, but that she felt stable on her current medications. Nurse Hargrove described Febo's hygiene and grooming as adequate, her eye contact fair; she was cooperative, alert, and oriented. Her speech was clear and her thought processes were organized, logical, and goal-directed.

At that time, Febo was prescribed Lithium, Wellbutrin, and Campral. Later reports indicate that, when Febo's anxiety and depression increased, Campral was discontinued and replaced by Vistaril. Initially, Febo was assessed to have a Global Assessment of Functioning

("GAF") score of 50, and over time her GAF score increased to 55. [1] Nevertheless, her depression worsened and was exemplified by non-specific suicidal thoughts.

Later, Lithium was discontinued and replaced by a trial of Lamictal. In July 2009, Ms. Hargrove indicated that her mood stabilized. Reports from Seminole County indicate that her mood was stable through February 2010.

### B. FEGS Biopsychosocial Summary

Febo moved to New York in 2010. On May 6, 2010, she was seen by a social worker at the Federation Employment and Guidance Service ("FEGS") Health and Human Services who completed a "Biopsychosocial Summary."

At FEGS, Febo provided information about her past drug and alcohol use and treatment: as a teenager, Febo had used crack cocaine, heroin, and alcohol on a daily basis. She attended in-patient treatment in Queens from January 1991 to September 1993, which was "unsuccessful," (R. 182-83.). In 2005, she received two years of treatment for depression and bi-polar disorder while in Orlando, Florida. Febo reported that she had considered hurting or killing others, but did not consider hurting or killing herself. The social worker reported, "Last time client had suicidal thought was yesterday. Plan had thought of obtaining and overdosing her medications. Client reported that last time she thought of hurting someone else was within the last week. Client

---

[1] "GAF rates overall psychological functioning on a scale of 0-100 that takes into account psychological, social, and occupational functioning." Zabala v. Astrue, 595 F.3d 402, 405, n.1 (2d Cir. 2010) (citing American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV"), at 34 (4th ed. rev. 2000)). See also Briscoe v. Astrue, 11 Civ. 3509 (GWG), 2012 WL 4356732, at *2 (S.D.N.Y. Sept. 25, 2012). A GAF score from 41 to 50 represents "Serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." See http://www.omh.ny.gov/omhweb/childservice/mrt/global_assessment_functioning.pdf (last visited July 2, 2013). A GAF score from 31 to 40 represents "Some impairment in reality testing or communication . . . OR major impairment in several areas, such as work or school, family relations, judgement, thinking, or mood (e.g., depressed man avoids friends, neglect [sic] family, and is unable to work . . .)." Id.

reported when she had thought of hurting herself it was by overdosing on her medications." (R. 184.)

The FEGS report indicates that "nearly every day," Febo feels "down depressed or hopeless." (Id.) The report indicates that she has "little interest or pleasure in doing things," "trouble falling or staying asleep or sleeping too much, "trouble concentrating on things," and "feel[s] bad about [her]self. (Id.) The form indicated that "more than half the days," Febo has "poor appetite or overeating" and thinks that she would be "better off dead or hurting [her]self." The FEGS report describes her depression as "severe." (Id.)

FEGS hospital physician Dr. Rose Chan diagnosed Febo as having bi-polar, post-traumatic stress disorder, personality disorder, alcohol dependency, and hypoglycemia. Febo received a PHQ-9 score of 24, which corresponds to "Severe Depression," defined as "nearly all symptoms of major depressive disorder, and symptoms markedly interfere with daily functioning."[2] (See R. 187.) Dr. Chan considered Febo to have multiple barriers to employment, including "bi-polar disorder, depression, agitation around people, and inability to go outside by herself." (R. 186.) Dr. Chan commented that Febo has "substantial functional limitations to employment due to medical conditions that will last for at least 12 months and make the individual unable to work." (R. 194.)

### C.  Center for Comprehensive Health Practice: Dr. Andrea Clair, Treating Physician

On May 25, 2010, Febo appeared at the Center for Comprehensive Health Practice ("CCHP") for intake. She reported current alcohol use, appetite disturbance with weight gain,

---

[2] PHQ-9 is a "Personal Health Questionnaire," a scale used by Cigna Behaviorial Health. See http://www.cignabehavioral.com/web/basicsite/provider/treatingBehavioralConditions/PHQ9XscoringAndActionsv2.pdf (last visited August 24, 2013).

depression, and anxiety. She was admitted to the chemical dependence program at CCHP and described as having "significant" depression and alcohol problems. (R. 331.)

On June 2, 2010, Febo began meeting with Dr. Andrea Clair, who diagnosed Febo with alcohol dependence and bi-polar II disorder (manic depression). Over the next two years, Dr. Clair met with Febo approximately every two to four weeks. The sessions reveal continuous, though fluxuating, depression treated with different combinations of medications, with an overall upward trend in Febo's mood. A summary of the meetings follows.

On June 16, 2010, Dr. Clair conducted an intake exam. She recorded that Febo described outbursts of anger of 30 minute durations and irritability that lasted for an entire day; she described feeling overwhelmed and crying. Dr. Clair noted that Febo experienced sadness most days, sleep disturbance, decreased appetite, passive suicidal ideation, fatigue, concentration problems, and intrusive thoughts. Dr. Clair diagnosed alcohol dependence and bi-polar disorder. She prescribed Atarax, Lamictal, and Wellbutrin. (Id.) Dr. Clair recorded Febo's substance abuse history, as well as a few personal details, such as that she had recently lost an uncle and brother.

On July 15, 2010, Dr. Clair noted that Febo had been drinking regularly and had used marijuana in the last few weeks. On July 22, 2010, Febo reported no alcohol use, but some recent marijuana use. She experienced depression and lack of motivation, irritability, and social withdrawal. On August 5, 2010, Febo had been clean for 12 days, but complained of anxiety, disturbed sleeping, irritability, and social withdrawal. Dr. Clair noted that she was tearful. On August 24, 2010, Dr. Clair noted that Febo was depressed and agitated, and that she did not want to take any more medication. She had been sleeping fairly well, and had admitted to using alcohol once in the previous period. On August 26, 2010, Febo reported that Seroquel had made

her drowsy. On September 16, 2010, Dr. Clair reported that Febo had been drinking and her mood had been "up and down;" she had felt "irritable." (R. 320.)

On October 6, 2010, Dr. Clair noted that Febo had been staying with her boyfriend, and that she had not gone out for two weeks. Febo described having fatigue, racing thoughts and trouble sleeping. On November 4, 2010, Dr. Clair noted that Febo had forgotten to take her medication for a few days. On November 9, 2010, Dr. Clair indicated that Febo seemed discouraged and stressed, but less irritable. On December 16, 2010, Dr. Clair reported that Febo had stopped taking certain medications because she was feeling better, but then became depressed and used alcohol. Dr. Clair also reported that the Lamictal made Febo feel "jittery" and "hyper." (R. 311.)

On February 17, 2011, Dr. Clair indicated that Febo was less irritable after an increased dosage of Lithium; nevertheless, she was tired and withdrawn after being sober for only 25 days. On March 22, 2011, Dr. Clair reported that Febo was feeling down and low energy. But on April 6, 2011, Dr. Clair reported that Febo was "feeling really well," was not having trouble sleeping and had "more energy." (R. 297.) The medications seemed to be working.

On April 24, 2011, Dr. Clair reported that Febo was experiencing "more good days than bad," and that she had been "sleeping pretty well." (R. 296.) On May 10, 2011, Dr. Clair reported that Febo was "doing a lot better, although still somewhat withdrawn." (R. 295.) On May 24, 2011, Dr. Clair reported her breathing was better, and that she had been exercising. She reported that, despite a few social interactions, she still keeps to herself a lot. She observed a tendency to worry. On June 7, 2011, Dr. Clair reported that Febo was "getting out more, doing things, challenging self." (R. 290.) She reported "ups and downs" but more good than bad. (Id.) On June 29, 2011, she indicated that Febo was anticipating a trip to Florida, even though it holds

bad memories. She reported not sleeping well and eating a lot. At that time she had been sober for five months. (R. 288.)

On May 17, 2011, Dr. Clair completed a Report for Claim of Disability Due to Mental Impairment. She diagnosed Febo with bi-polar disorder and alcohol dependence. She described "racing thoughts, distractibility, mood swings, irritability, periods of depression associated with [lowered] appetite, passive suicidal ideation, fatigue, morbid thoughts, [concentration and] memory problems, feelings of being overwhelmed, etc. Anxiety." She described Febo as appropriately dressed, having normal psychomotor activity, and speaking fluently. She noted that Febo sometimes hears noises in her head but has no visual hallucinations or psychosis. She predicted that Febo's mental disorder would last more than 12 months. At this time, Febo was taking Lamictal, Wellbutrin, Buspar, Camprol, and Lithium

Dr. Clair indicated that Febo has "moderate" restriction of activities of daily living and in maintaining social functioning. (R. 271.) She indicated that Febo has "marked" deficiencies in concentration, persistence, or pace resulting in failure to complete tasks in a timely manner. She indicated that Febo experiences "repeated (3 or more)" episodes of decompensation. (R. 272.)

To elaborate on her findings, Dr. Clair was provided with a list of symptoms. She wrote check marks next to certain symptoms to indicate that Febo was "not significantly limited" in her ability to remember locations and work-like procedures and to understand and remember short, simple instructions. She marked that Febo was "moderately" limited in her ability to understand and remember detailed instructions and make simple work-related decisions. She described Febo as "markedly limited" in her ability to maintain attention and concentration, perform activities within a schedule, maintain regular attendance and be punctual, sustain an ordinary routine without special supervision, work in coordination with or in proximity to others without being

9

distracted, and complete a normal work week without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonably lengthy rest period.

Regarding Febo's social skills, Dr. Clair noted that Febo is "markedly limited" in all categories: her abilities to interact appropriately with the general public, ask simple questions, accept instructions and respond appropriately to criticism from supervisors, get along with coworkers or peers, and maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness. Regarding her adaptation abilities, Dr. Clair indicated that Febo is "markedly limited" in her ability to respond appropriately to changes in the work setting, travel in unfamiliar places or use public transportation, and set realistic goals or make plans independently of others, and that she is "moderately limited" in her ability to be aware of normal hazards and take appropriate precautions.

On July 13, 2011, Dr. Clair completed a Psychiatric/Psychological Impairment Questionnaire. She assessed Febo with a GAF score of 55, and commented that the "prognosis is poor for Ms. Febo to be able to work in the foreseeable future." (R. 397.) This opinion was based on clinical findings, which included appetite, sleep, and mood disturbance, emotional lability, substance dependence, anhedonia, difficulty thinking or concentrating, passive suicidal ideation, social withdrawal, decreased energy, manic syndrome, and irritability. She noted that Febo had been hospitalized about five times since 2006. In her opinion, Febo's primary symptoms were "racing thoughts, distractability, mood swings, irritability, periods of depression associated [with decreased] appetite, passive suicidal ideation, fatigue, morbid thoughts, [concentration] problems, anxiety." (R. 399.) Dr. Clair indicated that the type of decompensation that Febo experiences on a regular basis is mood disturbance.

At the time Dr. Clair completed this Questionnaire, Febo was taking Lamictal, Wellbutrin, Buspar, Campral, and Lithium. She indicated that Febo is incapable of tolerating even low stress and that her impairments are likely to produce "good days and bad days." (R. 403.) She estimated that Febo would be likely to be absent from work "more than three times a month." (R. 404.)

On August 31, 2011, Dr. Clair completed a form that expressed her opinion that Febo "is totally disabled without consideration of any past or present drug and/or alcohol use. Drug and/or alcohol abuse is not a material cause of [Febo's] disability. It is my best medical opinion that the use is not material because . . . [Febo] is currently not using drugs and/or alcohol and remains disabled." (R. 434.)

### D.  State Agency Consultants: Drs. Flach and Reddy

On July 22, 2010, at the request of the Social Security Administration, Febo's condition was evaluated by Dr. Christopher Flach at the Industrial Medicine Associates. At the time, she was taking Lamictal, Wellbutrin, Atarax, Lithium, and Buspirone.

Dr. Flach met with Febo on this day and diagnosed her with depression and anxiety. He noted that she has occasional panic attacks that occur mostly when she is in crowds or by herself, last up to five minutes, and occur twice daily. Febo did not report thought disorder or auditory hallucinations at this time, but described her affect as depressed, and noted a dysthymic mood and a mildly impaired memory. Dr. Flach described Febo as a "cooperative, socially adequate individual." (R. 241.) The medical source statement indicated that she is "able to follow and understand simple directions and instructions. She can perform simple tasks independently. She is maintaining attention and concentration. She is able to maintain a regular schedule. She is learning new tasks. She is performing complex tasks independently . . . She does appear to have

mild problems dealing with stress. The result of the examination do [*sic*] appear consistent with some psychiatric problems and a history of substance abuse difficulties which do seem as though they may mildly interfere with the claimant's ability to function on a daily basis." (R. 243.) Dr. Flech commented that the "Prognosis seemed good." (Id.)

On August 12, 2010, a medical consultant, Dr. V. Reddy, reviewed Febo's files and completed a Mental Residual Functional Capacity Assessment. Dr. Reddy concluded that she was "not significantly limited" in her ability to remember locations and work-like procedures and to understand and remember short and simple instructions. Dr. Reddy indicated that Febo was "not significantly limited" in her ability to carry out short and simple instructions, maintain attention and concentration for extended periods, perform activities within a schedule, maintain regular attendance, and be punctual, to sustain an ordinary routine without special supervision, or work in coordination or proximity with others without being distracted by them, or make simple work-related decisions. Dr. Reddy further indicated that Febo is "moderately" limited in her ability to understand, remember detailed instructions and carry out detailed instructions, complete a normal workday and workweek without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods. (R. 260-61.)

Regarding Febo's level of social interaction, Dr. Reddy found that she was "not significantly limited" in her ability to interact appropriately with the general public, ask simple questions, or maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness. Dr. Reddy found that Febo was "moderately limited" in her ability to accept instructions and respond appropriately to criticism, and get along with coworkers without distracting them or exhibiting behavioral extremes. Regarding her adaptation, Dr. Reddy found

that she was "not significantly limited" in her ability to respond appropriately to changes, be aware of normal hazards and take appropriate precautions, and set realistic goals or plans independently of others. Dr. Reddy indicated that Febo was "moderately limited" in her ability to travel in unfamiliar places or use public transportation. (R. 261.)

Based on a review of the file, Dr. Reddy concluded that Febo could perform entry level work in low contact, low stress setting.

### E.  Records Submitted to Appeals Council

On November 15, 2011 and April 28, 2012, Febo submitted additional evidence to the Appeals Council.

#### 1.  Dr. Ronald Sherman

On November 12, 2011, Dr. Ronald Sherman, a psychologist, met with Febo. He described her as "fidgety and restless" and noted that she traveled from the Bronx to Manhattan by bus with her sister for the meeting. (R. 436.) He reported discussing the onset of her depression and anxiety and the history of her drug use, and brief involvement with the law. He discussed her medical treatment and described her mental status. Dr. Sherman concluded that Febo is "totally disabled emotionally and unable to function in any job in any capacity. Substance abuse including alcohol and/or drugs was not a contributing factor." (R. 438.)

Dr. Sherman completed the same Psychiatric/Psychological Impairment Questionnaire that was presented to Dr. Clair. His clinical findings are largely similar, but he added that Febo suffers from delusions or hallucinations, psychomotor agitation or retardation, paranoia or inappropriate suspiciousness, feelings of guilt and worthlessness, a blunt, flat or inappropriate affect, obsessions or compulsions, intrusive recollections of traumatic experiences, persistent traditional fears, and generalized persistent anxiety,

Dr. Sherman indicated that Febo has "no evidence of limitation" in the following areas concerning understanding and memory: the ability to remember locations and work-like procedures; and the ability to understand and remember one or two-step instructions. He opined that she was "markedly limited" in her ability to understand and remember detailed instructions. In the area of concentration and persistence, Dr. Sherman indicated that Febo was "mildly limited" in her ability to carry out simple one or two-step instructions and make simple work related decisions. He indicated that she was "markedly limited" in the following areas: the ability to carry out detailed instructions, the ability to maintain attention and concentration for extended periods, the ability to perform activities within a schedule and maintain regular attendance and be punctual, the ability to sustain ordinary routine without supervision, the ability to work in coordination with or proximity to others without being distracted by them, and the ability to complete a normal workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods.

In the area of social interactions, Dr. Sherman indicated that Febo was "moderately limited" in her ability to ask simple questions or request assistance and her ability to maintain socially appropriate behavior and adhere to basic standards of neatness. He found that she was "markedly limited in her ability to interact appropriately with the general public, to accept instructions and respond appropriately to criticism from supervisors, get along with coworkers or peers without distracting them or exhibiting behavioral extremes. In the area of adaptation, Dr. Sherman indicated that Febo was "moderately limited" in her ability to be aware of normal hazards and take appropriate precautions; and "markedly limited" in her ability to respond appropriately to changes in the work setting, to travel to unfamiliar places or use public transportation, and to set realistic goals or make plans independently. (R. 442-44.)

14

In Dr. Sherman's view, Febo was unable to tolerate "even low stress" in a work setting. Unlike Dr. Clair, he suggested that the impairments are not likely to produce "good days and bad days." (R. 446.)

### 2. Treating Physician Notes

Febo's counsel also submitted additional clinical findings from Dr. Clair. On July 19, 2011, Febo described herself to Dr. Clair as "up and down," under a lot of stress, and very forgetful; she mentioned she was depressed and not going to the gym; however, she reported sleeping well. (R. 475.) On August 11, 2011, Febo described herself as "struggling but okay." (R. 471.) On August 24, 2011, Dr. Clair noted that Febo had to "drag herself here today." (R. 470.) On September 7, 2011, Dr. Clair noted that Febo was nervous about the SSD hearing, and had been frightened during the hurricane and after the earthquake for about a week afterward. On October 18, 2011, Dr. Clair quoted Febo as saying "Mood is good," and noted that she had joined a gym. (R. 466.) On December 11, 2011, Dr. Clair noted that Febo was "feeling pretty well," and spent a "happy Thanksgiving with family and friends." (R. 457.) She wrote, Febo "cooked and hosted and she accomplished it without drinking!" (Id.) On February 9, 2012, Dr. Clair commented that Febo was "doing well." (R. 453.) She noted that Febo was moving into her mother's apartment. She noted that she was waiting on SSI, but that she would rather work in home care. She reported going to the gym. On March 8, 2012, Dr. Clair noted that Febo had started school to be a Home Health Aide.

## DISCUSSION

### I.    Standard of Review

A party may move for judgment on the pleadings "[a]fter the pleadings are closed – but early enough not to delay trial." Fed. R. Civ. P. 12(c). A Rule 12(c) motion should be granted "if,

from the pleadings, the moving party is entitled to judgment as a matter of law." Dargahi v. Honda Lease Trust, 370 F. App'x 172, 174 (2d Cir. 2010). In reviewing a decision of the Commissioner, a court may "enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).

A determination of the ALJ must be supported by substantial evidence. Rosa v. Callahan, 168 F.3d 72, 77 (2d Cir. 1999). "Substantial evidence" is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Halloran v. Barnhart, 362 F.3d 28, 31 (2d Cir. 2004) (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)). If the findings of the Commissioner as to any fact are supported by substantial evidence, those findings are conclusive. Diaz v. Shalala, 59 F.3d 307, 312 (2d Cir. 1995). "Where there is substantial evidence to support either position, the determination is one to be made by the factfinder." Alston v. Sullivan, 904 F.2d 122, 126 (2d Cir. 1990). This means that if there is sufficient evidence to support the final decision, a district court must grant judgment in favor of the Commissioner.

If the Court finds that the ALJ decision is not supported by substantial evidence, there are gaps in the administrative record, or the ALJ has applied the improper legal standard, the court should remand the case for further development of the evidence. See, e.g., Rosa, 168 F.3d at 82-83 (citations omitted). If the record provides "persuasive proof of disability and a remand for further evidentiary proceedings would serve no purpose," the court may reverse and remand solely for the calculation and payment of benefits. Parker v. Harris, 626 F.2d 225, 235 (2d Cir. 1980); Rosa, 168 F.3d at 83.

II.     **Definition of Disability**

A claimant is disabled under the Social Security Act if the claimant is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The claimant's impairment must be "of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A). The disability must be "demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3).

Under the Act, the Social Security Administration has established a five-step sequential evaluation process when making disability determinations. See 20 C.F.R. §§ 404.1520, 416.920. The steps are followed in order; if it is determined that the claimant is not disabled at a step of the evaluation process, the evaluation will not progress to the next step. The Court of Appeals for the Second Circuit has described the process as follows:

> First, the Commissioner considers whether the claimant is currently engaged in substantial gainful activity. Where the claimant is not, the Commissioner next considers whether the claimant has a "severe impairment" that significantly limits her physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment that is listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, she has the residual functional capacity to perform her past work. Finally, if the claimant is unable to perform her past work, the burden then shifts to the Commissioner to determine whether there is other work which the claimant could perform.

Jasinski v. Barnhart, 341 F.3d 182, 183–84 (2d Cir. 2003) (citation omitted).  A claimant bears the burden of proof as to the first four steps, while the Commissioner bears the burden at the

final step. Schaal v. Apfel, 134 F.3d 496, 501 (2d Cir. 1998). Thus, in order to support a finding

that the claimant is not disabled at the fifth step, the Commissioner must offer evidence

demonstrating that other work exists in significant numbers in the national and local economies

that the claimant can perform, given the claimant's residual functional capacity, age, education

and past relevant work experience. 20 C.F.R. §§ 404.1512(f), 404.1560(c), 416.912(f),

416.960(c).

The Code of Federal Regulations provides additional guidance for evaluations of mental

impairments. Calling it a "complex and highly individualized process," 20 C.F.R. §

404.1520a(c)(1), the section focuses the ALJ's inquiry on determining how the impairment

"interferes with [the claimant's] ability to function independently, appropriately, effectively, and

on a sustained basis," 20 C.F.R. § 404.1520a(c)(2). The main areas that are assessed are:

activities of daily living; social functioning; concentration, persistence, or pace; and episodes of

decompensation. The first three are rated on a "five-point scale:" none, mild, moderate, marked,

and extreme. 20 C.F.R. § 404.1520a(c)(4). The last area, episodes of decompensation, is rated on

a "four-point scale:" none, one or two, three, and four or more. Id. If an impairment is given the

rating of "severe," then the ALJ is instructed to determine whether the impairment qualifies as a

listed mental disorder. 20 C.F.R. § 404.1520a(d)(2).

A mental disorder will qualify as a "listed impairment" if it is "[c]haracterized by a

disturbance of mood, accompanied by a full or partial manic or depressive syndrome. Mood

refers to a prolonged emotion that colors the whole psychic life; it generally involves either

depression or elation." 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.04. To reach the required

severity requirement, the individual must (A) show signs of depressive, manic, or bi-polar

syndrome, and *either* (B) experience "marked restriction" in two of the following: (i) activities of

daily living; (ii) maintaining social functioning; (iii) maintaining concentration, persistence, or pace; or (iv) repeated episodes of decompensation (the so-called "B Criteria"); *or* (C) "have a medically documented history of chronic affective disorder of at least two years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support" (the so-called "C Criteria"). Id.

An anxiety-related disorder will qualify as a "listed impairment" if it is "the predominant disturbance or . . . the individual attempts to master symptoms; for example, confronting the dreaded object or situation in a phobic disorder or resisting the obsessions or compulsions in obsessive compulsive disorders." 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.06. To reach the required severity level, the individual must have: generalized persistent anxiety; a persistent irrational fear of a specific object, activity, or situation that results in a compelling desire to avoid it; recurrent severe panic attacks manifested by a sudden unpredictable onset of intense apprehension, fear, terror, and sense of impending doom; recurrent obsessions or compulsions which a source of marked distress; or recurrent and intrusive recollections of a traumatic experience. These symptoms must either (A) result in "marked restriction" in two of the following: (i) activities of daily living; (ii) maintaining social functioning; (iii) maintaining concentration, persistence, or pace; or (iv) repeated episodes of decompensation; or (B) result in complete inability to function independently outside the area of one's home. 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.06.

## III.    The ALJ's Determination

At steps 1 and 2, the ALJ found that Febo had not engaged in substantial gainful activity since April 4, 2009, and that her depression constituted a severe impairment within the meaning

of the SSA and Regulations. At step 3, however, he found that Febo does not have an impairment that meets or medically equals the severity of a listed impairment under 20 C.F.R. Part 404, Subpart P, Appendix 1. In making this finding, the ALJ first found that neither the "B Criteria" nor the "C Criteria" was satisfied. Regarding Febo's activities of daily living, he found that she had only mild restriction. He observed that she has some difficulties traveling in unfamiliar places, but that she is able to care for her personal needs such as grooming, cleaning, and cooking. Regarding social functioning, he noted mild difficulties, but observed that she was able to get along with her family, doctors, and social workers. Regarding concentration, he noted moderate difficulties because she has difficulty carrying out detailed instructions. He found that Febo had experienced no episodes of decompensation that have been of extended duration.

Before proceeding to step 4, the ALJ evaluated Febo's residual functional capacity ("RFC"). To do this, the ALJ followed a two-step process. First, he considered whether Febo had a medically determinable mental impairment that could reasonably be expected to produce the claimed symptoms. Second, he reviewed the record to determine whether the intensity, persistence, and limiting effects of the symptoms limited Febo's overall functioning. The ALJ examined the opinions of the various individuals who had met with Febo. He reviewed the records of Nurse Hargrove, social worker Bilok, Dr. Chan, and Dr. Clair, all treating professionals, and the consultative physicians, Drs. Flach and Reddy. He concluded that Febo has the ability to work at all levels, limited to simple two- and three-step jobs.

Recognizing that his RFC assessment was at odds with Febo's self-reporting, the ALJ evaluated her credibility. Based on the evaluations of the various physicians, the ALJ reached the conclusion that, although Febo's impairment could be expected to cause the alleged symptoms, Febo's statement about the intensity, persistence, and limiting effects of the statements "are not

credible to the extent they are inconsistent with the above residual functional capacity assessment." (R. 22.)

To support his conclusion, the ALJ specified several inconsistencies in the record that, in his view, undermined Febo's credibility. He observed that she is able to care for her personal needs and has the ability to seek public assistance and plan trips to and from Florida and New York. In contrast, he found that his RFC determination was supported by the consultative examination and the State agency medical file review. Citing § 404.1527(d)(2) and § 416.927(d)(2) of the Code, the ALJ found that the medical opinions provided by Drs. Flach and Reddy, the consultative physicians, were entitled to great weight. He based this on the fact that the consultants reviewed the medical evidence, they were experts in the field of disability, and their opinions were consistent with Febo's abilities to care for her personal needs, travel from one state to another, and seek public assistance. He found that the opinion of Dr. Clair, the treating physician, was entitled to little weight because it was inconsistent with the medical record and the claimant's functioning level. He explained that the opinions of social worker Bilok and Nurse Hargrave are entitled to even less weight because they are not acceptable medical sources within the regulatory requirements.

At step four, the ALJ found that Febo is not able to perform her past relevant work. At step five, the ALJ considered Febo's age, her level of education and linguistic skills, and her RFC and found that there are jobs that exist in significant numbers in the national economy that Febo can perform.

## IV.   The Treating Physician Rule

The "treating physician rule" instructs the ALJ to give controlling weight to the opinions of a claimant's treating physician, as long as the opinion is well-supported by medical findings

and is not inconsistent with the other evidence in the record. 20 C.F.R. §§ 404.1527(c)(2),

416.927(c)(2). While the decision on the ultimate issue of disability is one reserved for the

Commissioner, 20 C.F.R. § 404.1527(d)(2); Snell v. Apfel, 177 F.3d 128, 133 (2d Cir. 1999) ("A

treating physician's statement that the claimant is disabled cannot itself be determinative."), the

ALJ cannot substitute his own expertise or view of the medical proof for the treating physician's

opinion, Shaw v. Chater, 221 F.3d 126, 134 (2d Cir. 2000).

Even when a treating physician's opinion is not given controlling weight, it is still

entitled to "significant weight because the treating source is inherently more familiar with a

claimant's medical condition than are other sources." Santiago v. Barnhart, 441 F. Supp. 2d 620,

627 (S.D.N.Y. 2006) (citations omitted). To determine its precise value, the regulations instruct

the ALJ to evaluate the following six factors: (1) the length of the treatment relationship and the

frequency of examination; (2) the nature and extent of the treatment relationship; (3) the

evidence that supports the treating physician's report; (4) how consistent the treating physician's

opinion is with the record as a whole; (5) the specialization of the physician in contrast to the

condition being treated; and (6) any other significant factors. 20 C.F.R. § 404.1527(c)(2)-(6).

This process must be transparent: the regulations state that the Commissioner "will always give

good reasons in our notice of determination or decision for the weight we give your treating

source's opinion." 20 C.F.R. § 404.1527(c)(2). Indeed, where an ALJ does not credit the

findings of a treating physician, the claimant is entitled to an explanation of that decision. Snell,

177 F.3d at 134; Shaw, 221 F.3d at 134 ("The regulations . . . require the ALJ to set forth her

reasons for the weight she assigns to the treating physician's opinion."). In this Circuit, the

requirements of the rule are rigorously applied; they are not simply a "bureaucratic box to

check." Ellington v. Astrue, 641 F. Supp. 2d 322 (S.D.N.Y. 2009). As the Court of Appeals has explained:

> The requirement of reason-giving exists, in part, to let claimants understand the disposition of their cases, even—and perhaps especially—when those dispositions are unfavorable. A claimant . . . who knows that her physician has deemed her disabled, might be especially bewildered when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied.

Snell, 177 F.3d at 134 (citing Jerry L. Mashaw, Due Process in the Administrative State, 175–76 (1985)).

## V.   Analysis of the ALJ's Decision

Before concluding Febo is not disabled that within the meaning of the Act, the ALJ made two critical decisions: first, he found that the opinion of Dr. Clair, the treating physician, would be given "little weight;" second, he found that Febo's statements about the intensity of her symptoms were not credible. The Court finds that the ALJ committed several legal errors at both steps in his analysis.

### A.  The ALJ's Assessment of the Treating Physician's Opinion

The ALJ's application of the treating physician rule suffers from several related errors that justify remand: (1) the ALJ's decision that the treating physician's opinion was not entitled to controlling weight was not supported by substantial evidence; (2) in deciding that the treating physician's opinion was not controlling, the ALJ did not properly apply the six-factor test required by the regulations; and (3) the ALJ improperly assessed the weight of the consultative physicians' opinions.

#### 1.  Substantial Evidence

The ALJ found that the opinion of Dr. Clair, the treating physician, would be given "little weight" because her "opinion was inconsistent with the medical record and the claimant's

functioning level." (R. 22.). He cited three reasons to support this decision: (1) Febo is able to care for her personal needs; (2) she has the ability to seek public assistance; and (3) she has the capacity to plan trips to and from Florida and New York.

The Court finds these factors do not constitute sufficient contradictory evidence to disregard Dr. Clair's opinion. See 20 C.F.R. § 404.1527(d)(2); Veino v. Barnhart, 312 F.3d 578, 588 (2d Cir. 2002) (the opinion of treating physicians is controlling unless it is contradicted by "substantial evidence in the record"). It is true that Febo testified that she helps with laundry and grocery shopping, and that all records indicate that she presents as well-groomed and clean. But Febo's assistance with the daily chores does not plainly undermine her overall ability to care for her personal needs. See Rivera v. Apfel, 94 Civ. 5222 (MBM), 1999 WL 138920, at *10 (S.D.N.Y. Mar. 15, 1999) (commenting that the "[p]laintiff's performance of chores may prove that he was not an invalid, but it says little about whether he was disabled under the Act"). More generally, the record strongly suggests that the tasks the ALJ references approach the full extent of Febo's abilities. There are consistent references to the difficulty she faces when getting out of bed, the anxiety she faces when traveling alone, her tendency toward isolation, and her inability to focus on one task for an extended period. There are periodic references to harmful thoughts and panic attacks.

The Court is mindful that people who have chronic affective disorders often structure their lives in such a way as to minimize stress and reduce symptoms. 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.00(F) (in cases involving chronic mental disorders, overt symptomology may be minimized where a claimant is in a structured setting with fewer mental demands). This principle is highly relevant here: Febo appears to exist within the support network of her family that dramatically reduces the duties that she is required to assume. Given these concerns, the Court

does not consider the evidence cited by the ALJ regarding Febo's daily life sufficient to overcome Dr. Clair's opinion that Febo is unable to meet the demands of employment.

The ALJ's other reasons for finding that Dr. Clair's opinion is inconsistent with the evidence in the record are similarly unconvincing. The ability to seek public assistance cannot logically undermine a claimant's ability to seek disability benefits. See Nelson v. Bowen, 882 F.2d 45, 49 (2d Cir. 1989) ("When a disabled person gamely chooses to endure pain in order to pursue important goals, it would be a shame to hold this endurance against him in determining benefits unless his conduct truly showed that he is capable of working."). And it is inaccurate to say that Febo planned "trips to and from Florida and New York." The record shows that Febo left Florida in 2010 to start over, after being fired from her job and lapsing into drug and alcohol abuse. In New York, Febo could – and does – live with her mother and sister. On June 29, 2011, Dr. Clair noted that Febo was "anticipating" a trip to Florida, but there is no mention of the reason for the trip, no indication that Febo planned it, and no evidence that it actually took place. Regardless, Dr. Clair's treating notes indicate that the impending trip caused Febo anxiety, as her time in Florida held "bad memories." (R. 288.)

To the extent that the ALJ had additional reasons for his finding, he was required to identify these. 20 C.F.R. §§ 404.1527(c)(2); 416.927(c)(2); SSR 96-2p ("The notice of the determination or decision must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewer."). But without having additional reasons to consider, the Court is not convinced that the treating physician's opinion was inconsistent with substantial evidence in the record. The factors cited by the ALJ are not probative of an ability to

work and instead reflect habits of a person who conducts her life in a way that reduces sources of stress and anxiety.

### 2. The Six-Factor Test

Accepting, *arguendo*, that Dr. Clair's treatment opinion did not deserve controlling weight, the ALJ still failed to provide "good reasons" for his calculation. Halloran, 362 F.3d at 32-33. The regulations instruct that "good reasons" must include explanation of the six factors specified above to determine the degree of weight the treating physician's opinion receives. 20 C.F.R. § 404.1527 (c)(2)-(6); Schaal, 134 F.3d at 505; see also Ferraris v. Heckler, 728 F.2d 582, 587 (2d Cir. 1984) ("We of course do not suggest that every conflict in a record be reconciled by the ALJ or Secretary, . . . but we do believe that the crucial factors in any determination must be set forth with sufficient specificity to enable us to decide whether the determination is supported by substantial evidence.") (citations omitted).

Once the ALJ determined that Dr. Clair's statements included in the Report for Claim of Disability Due to Mental Impairment and the Psychiatric/Psychological Impairment Questionnaire were not controlling, he stated only that "claimant's treating physician, Dr. Clair, is given little weight because her opinion is inconsistent with the medical record and the claimant's functioning level." (R. 22.) From this statement, the Court cannot determine whether the clinical findings of treating physician were factored into the determination at all. Moreover, the ALJ referenced only one of the six factors, the fourth one that refers to the internal consistency of the record. See 20 C.F.R. § 416.927(c). The Court has already found the ALJ's evaluation of Febo's functioning level to be untethered to the evidence in the record. In addition, the ALJ does not mention the significant length of the treatment relationship between Dr. Clair and Febo, the nature and extent of the treatment relationship, what evidence, if any, in the record

that supports Dr. Clair's opinion, or whether Dr. Clair specializes in treatment of depression and anxiety. This is inadequate.

Accordingly, because the ALJ's explanation did not provide sufficient reasons for the weight assigned to a treating physician's opinion and did not conform to the structural requirements of 20 C.F.R. § 404.1527(c)(2)-(6), the Court finds that the ALJ committed legal error. See Halloran, 362 F.3d at 33 ("We do not hesitate to remand when the Commissioner has not provided "good reasons" for the weight given to a treating physician's opinion and we will continue remanding when we encounter opinions from ALJ's that do not comprehensively set forth reasons for the weight assigned to a treating physician's opinion."); Lopez v. Barnhart, 05 Civ. 10635 (JSR), 2008 WL 1859563, at *13 (S.D.N.Y. 2008) (remanding because it was "far from clear from the record what weight should have been assigned to [the treating physician's] opinion or what the disability determination would have been had the correct legal standards been applied").

### 3.   Assessment of the Consultative Physicians' Opinions

In preparing her claim for disability, Febo's claim was evaluated by two consulting physicians in New York. Dr. Flach met Febo only once, in 2010. Dr. Reddy did not meet with Febo at all; he merely reviewed her file. Nevertheless, after finding that the treating physician's opinion was inconsistent with the medical findings in the record and determining that Febo's statements lacked credibility, the ALJ decided to give the opinions of Drs. Flach and Reddy "great weight." Febo now argues that the ALJ erred in making this determination.

Because state agency medical and psychological consultants are "experts in the Social Security disability programs," ALJs are required to consider their findings about the severity of an individual's impairment. SSR 96-6p. But the Regulations caution that consulting physicians'

opinions are entitled only to limited weight because of their typically superficial exposure to the plaintiff. See 20 C.F.R. §§ 404.1527(c), 416.927(c); 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.00(E) ("The results of a single examination may not adequately describe your sustained ability to function. It is, therefore, vital that we review all pertinent information relative to your condition, especially at times of increased stress."); see also Santiago, 441 F. Supp. 2d at 629 ("The Treating Physician Rule recognizes that a physician who has a long history with a patient is better positioned to evaluate the patient's disability than a doctor who observes the patient once for the purposes of a disability hearing.") (citations omitted); Gonzalez v. Apfel, 113 F. Supp. 2d 580, 588-89 (S.D.N.Y. 2000) (the opinion of a physician who saw plaintiff only once deserves limited weight). The opinions of non-treating physicians may be entitled to greater weight than those of treating physicians, but only when those reports "provide[] more detailed and comprehensive information than what was available to the individual's treating source." SSR 96-6p. The rule is arguably more relevant in the context of mental disabilities, which by their nature are best diagnosed over time. 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.00(E).

The role of a *non-examining* physician in a social security determination is especially limited because the opinion is responsive to a review of the record only. As such, the opinion of a non-examining physician "cannot constitute the contrary substantial evidence required to override the treating physician's diagnosis." Hidalgo v. Bowen, 822 F.2d 294, 297 (2d Cir. 1987); Torres v. Bowen, 700 F. Supp. 1306, 1314 (S.D.N.Y. 1988) (citing Nelson v. Heckler, 712 F.2d 346, 348 (8th Cir. 1983) ("[T]o attempt to evaluate disability without personal examination of the individual and without evaluation of the disability as it relates to the particular person is medical sophistry at its best.") (citation omitted)).

It is certainly within the ALJ's discretion to conclude that the weight of the evidence supported the findings of Drs. Flach and Reddy over that of Dr. Clair. See 20 C.F.R. § 404.1527(d); Petrie v. Astrue, 412 F. App'x. 401, 405-06 (2d Cir. 2011) (affirming ALJ's decision to follow the opinions of the consultative psychologists where they were consistent with the mental status reports in the records and where the opinions of the other physicians was not born out of sustained or long-term engagement with the claimant). But the ALJ's reasons for doing so – that the consultants "review[ed] the medical evidence in the file, their opinions are based on disability expertise; and their opinions are consistent with the claimant's personal needs, her ability to travel from one state to another, and seek public assistance" – fall short of the expectations set in the regulations. Further, the law setting forth the relative weights treating physicians and consultative physicians should receive contemplates that the latter are experts who have access to the medical file. SSR 96-6p. And the Court has already found that the additional reasons are not an accurate representation of the record or an adequate basis on which to determine disability.

The information available to and provided by Dr. Clair is far more extensive than that provided by the consultants. The record includes treating notes that reflects frequent appointments over a period of 14 months. Dr. Clair completed a Report for Claim of Disability Due to Mental Impairment and a Psychiatric/Psychological Impairment Questionnaire in which she commented that Febo would be unable to tolerate even low stress work environments and would likely be absent from a job more than three days per month. Considering that Febo's treating physician described her as having "good days and bad days," (R. 403), the Court is not convinced that the consultants' opinions, reflecting a single meeting or a mere review of the file, are somehow superior reflections of Febo's condition. See SSR 96-6p.

Accordingly, the Court finds that the ALJ did not provide substantial evidence to support his decision to credit the consultative physicians' opinions over that of Febo's treating physician. Because of this and the other errors committed in the ALJ's application of the treating physician rule – failure to develop the record or follow the six-factor test – the Court recommends remand to the Commissioner. See Pratts v. Chater, 94 F.3d 34, 39 (2d Cir. 1996) (remand is appropriate where further findings or explanation will clarify the rationale for the ALJ's decision).

### B.  Credibility Assessment

Febo also argues that the Commissioner evaluated her credibility according to an incorrect legal standard when he stated that "claimant's statements concerning the intensity, persistence, and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity." (R. 22.)

Where, as here, there is conflicting evidence and opinions in the record about the intensity of a claimant's symptoms, the ALJ must make a credibility assessment. See, e.g., Snell, 177 F.3d at 135. The ALJ must take into account the claimant's reports of her symptoms, "but [he] is not required to accept the claimant's subjective complaints without question; he may exercise discretion in weighing the credibility of the claimant's testimony in light of other evidence in the record." Genier v. Astrue, 606 F.3d 46, 49 (2d Cir. 2010). The Commissioner, and not the reviewing court, is best placed to "pass on the credibility of witnesses, including the claimant's description of symptoms . . . and resolve material conflicts in the testimony." Gallardo v. Apfel, 96 Civ. 9435 (JSR), 1999 WL 185253, at *6 (S.D.N.Y. Mar. 25, 1999).

But this discretion is not "unbounded." Correale-Englehart v. Astrue, 687 F. Supp. 2d 396, 435 (S.D.N.Y. 2010). When ruling on credibility, the ALJ must take all pertinent evidence into consideration and provide "specific reasons for the finding on credibility, supported by the

evidence in the case record." SSR 96-7p; <u>Cruz v. Colvin</u>, 12 Civ. 7346 (PAC)(AJP), 2013 WL

3333040 (S.D.N.Y. July 2, 2013). If the claimant's testimony is not fully supported by clinical

evidence, the ALJ must consider the following factors: (1) daily activities; (2) location, duration,

frequency and intensity of any symptoms; (3) precipitating and aggravating factors; (4) type,

dosage, effectiveness and side effects of medications taken; (5) other treatment received; and (6)

other measures taken to relieve symptoms. 20 C.F.R. § 404.1529(c)(3)(i)-(vi).

Here, after finding that Febo had the residual functional capacity to perform work at all

levels, limited to simple two- to three-step tasks, the ALJ found that "claimant's statements

concerning the intensity, persistence, and limiting effects of these symptoms are not credible to

the extent they are inconsistent with the above residual functional capacity." (R. 22.) The reasons

he provided were that Febo is "able to care for her personal needs; has the ability to seek public

assistance; and has the capacity to plan trips to and from Florida and New York." (<u>Id.</u>)

As an initial matter, the ALJ did not complete the six-factor analysis required under 20

C.F.R. § 404.1529(c)(3) before discrediting Febo's credibility. His opinion that Febo

demonstrated the ability "to care for her personal needs" most closely approximates the first

factor, which evaluates the claimant's daily activities. But the Court has already found that there

is not substantial evidence in the record to support this conclusion, and that her ability to seek

public assistance and plan trips to Florida are not probative of an ability to work. The ALJ should

have made clear how he reconciled his position with other evidence in the record, for example,

the wide and fluctuating range of medications that Febo has been prescribed to control her

symptoms, her persistent tendency to isolation, her additional treatment for alcoholism, and the

fact that Febo's anxiety is clearly triggered by social interactions.

In addition, the methodology described by the ALJ to explain his credibility determination strongly suggests that he weighed the medical evidence in the record against the inability to work. The Seventh Circuit has found that this approach "gets things backwards" because it "implies that the ability to work is determined first and is then used to determine the claimant's credibility." Bjornson v. Astrue, 671 F.3d 640, 645 (7th Cir. 2012). The language used here is a boilerplate that the Bjonrson court found to be inconsistent with SSR 96-7p. That Ruling states that "an individual's statements about the intensity and persistence of pain or other symptoms or about the effect the symptoms have on his or her ability to work may not be disregarded solely because they are not substantiated by medical evidence." SSR 96-7p. The Seventh Circuit's critique has been adopted by courts in this Circuit. See, e.g., Cruz, 2013 WL 3333040, at * 16 ("The ALJ's conclusory reasoning is unfair to the claimant, whose subjective statements about his symptoms are discarded if they are not compatible with an RFC that has been predetermined based on other factors."); Otero v. Colvin, 12 Civ. 4757, 2013 WL 1148769, at *7 (E.D.N.Y. Mar. 19, 2013) ("[I]t makes little sense to decide on a claimant's RFC prior to assessing her credibility. It merely compounds the error to then use that RFC to conclude that a claimant's subjective complaints are unworthy of belief.").

The Commissioner cites Campbell v. Astrue, 465 F. App'x 4 (2d Cir. 2012), to argue that the ALJ's methodology is sound. In Campbell, the ALJ used a similar two-step process for assessing the claimant's credibility, first determining the RFC and, second, weighing the claimant's statements against that determination. The Court finds two reasons why Campbell is inapposite.

First, in Campbell, the ALJ's residual functional capacity finding underlying the credibility assessment of Mr. Campbell was far more tethered to the medical findings than that at

issue here. The ALJ's opinion that Mr. Campbell could perform light work was consistent with that of several treating physicians and Mr. Campbell's own admission that his heightened symptoms, seizures, were the result of failure to take his medication. Id. at *6. In this case, however, the ALJ disregarded treating physician's opinion that Febo is unable to meet the demands of the workplace and provided reasons for doing so that the Court has already found inadequate. Further, the ALJ failed to reconcile his finding with other patterns in the record.

Secondly, although the Court of Appeals tacitly approved the ALJ's phrasing – that Mr. Campbell's symptoms are not credible "to the extent [they were] inconsistent with the . . . residual functional capacity," the exact "template" with which the Seventh Circuit and other district courts in this Circuit have taken issue – what the ALJ actually did in that case was quite different. There, the ALJ compared Mr. Campbell's subjective statements with the objective medical evidence in the record, and found that the claimant was not credible because the testimony as to the frequency of the seizures and his inability to stand was inconsistent with the medical records *and* the opinions of his treating physicians. Campbell v. Comm'r of Soc. Sec., 10 Civ. 308 (LEK)(ATB), 2010 WL 5536324 (N.D.N.Y. Dec. 20, 2010) report and rec adopted, 2011 WL 43224 (N.D.N.Y. Jan. 6, 2011). The district court approved this methodology, commenting that "the ALJ . . . has the discretion to evaluate credibility in light of *the evidence in the record*." Campbell, 2010 WL 5536324, at *9 (emphasis added). Thus, while the Court of Appeals appeared to endorse (or at least not object to) the methodology furthered here, it is plain that, in Campbell, the ALJ simply attached the SSA's template onto an otherwise sound assessment. That was not done here.

Here, by contrast, the ALJ made his own assessment that Febo has the residual functional capacity to perform work at all levels (which was not supported by substantial evidence) and,

subsequently, found her to lack credibility because her statements were inconsistent with his finding. The Court agrees that this "gets things backwards." Bjonrson, 671 F.3d at 645; SSR 96-7p; see also Correale-Englehart, 687 F. Supp. 2d at 435  ("The issue is not whether the clinical and objective findings are consistent with an inability to perform all substantial activity, but whether plaintiff's statements about the intensity, persistence, or functionally limiting effects of her pain are consistent with the objective medical and other evidence.")

Accordingly, because the ALJ committed legal error in assessing Febo's credibility, the Court recommends remand.

## VI.    Use of the Medical-Vocational Guidelines

Febo argues that the ALJ's opinion cannot be affirmed because the ALJ relied on the Medical-Vocational Guidelines at step five of the analysis, instead of producing the testimony of a vocational expert to reflect on Febo's ability to perform unskilled work.

The burden at step five of the evaluation of disability rests with the Commissioner, who must show that the claimant has the residual functional capacity to perform substantial gainful activity in the national economy. Schaal, 134 F.3d at 501. The Medical-Vocational Guidelines guide this evaluation, placing claimants with exertional impairments into grid categories according to their RFC, age, education, and work experience. 20 C.F.R. § 404.1520(f). Where on the grid a claimant is placed affects the evaluation of whether or not the claimant can engage in gainful work in the national economy.

When a claimant's impairment is not purely physical (that is, it is "nonexertional"), the responsibility of the ALJ is enhanced because the Medical-Vocational Guidelines are not "fully applicable." Medical-Vocational Guidelines, 20 C.F.R. Part 404, Subpart P, App. 2, § 200.00(e). If nonexertional impairments diminish a claimant's abilities to perform work, the "decisionmaker

must not assume that failure to meet or equal a listed mental impairment equates with capacity to do at least unskilled work." SSR 85-15. Rather, to evaluate the effect of significant nonexertional impairments on a claimant's ability to perform work, the ALJ should seek out the testimony of a vocational expert or other relevant evidence. Rosa, 168 F.3d at 78, 82 ("[S]ole reliance on the [g]rid[s] may be precluded where the claimant's exertional impairments are compounded by significant nonexertional impairments . . . . Instead, the Commissioner must introduce the testimony of a vocational expert . . . that jobs exist in the economy which claimant can obtain and perform.") (internal quotations omitted) (citing Bapp v. Bowen, 802 F.2d 601, 603 (2d Cir. 1986)). Under the law of this Circuit and the SSA Guidelines, the ALJ must call a vocational expert to evaluate a claimant's significant non-exertional impairments in order to meet the burden at step five. Acevedo v. Astrue, 11 Civ. 8853 (JMF)(JLC), 2012 WL 4377323, at *13 (S.D.N.Y. Sept. 4, 2012); Giannasca v. Astrue, 07 Civ. 341 (VB), 2011 WL 4445141, at *2 (S.D.N.Y. Sept. 26, 2011).

In this case, the ALJ did not consult a vocational expert to reflect on Febo's ability to perform unskilled work because he had already concluded that Febo's mental limitations had "little or no effect on the occupational base of unskilled work," (R. 22), and that her residual functional capacity allowed her to perform work at all levels, confined to simple two- to three-step tasks. See Cotto v. Astrue, 10 Civ. 9005 (KBF), 2012 WL 2512054, at *7 (S.D.N.Y. June 28, 2012) (holding that the ALJ did not err by failing to take the testimony of a vocational expert when the nonexertional impairments of the plaintiff were not so significant that reliance on the grids was inappropriate).

After clarification and development of the record, however, the testimony of a vocational expert may be necessary. Should Febo's mental impairments be determined to be more severe

than originally credited, reliance on the Medical-Vocational Guidelines, as the ALJ did in the hearing, may be inappropriate, and the ALJ may not meet the Commissioner's burden at step five. Rosa, 168 F.3d at 82.

**VII.    Appeals Council Material**

Finally, Febo argues that remand is warranted based on the evidence submitted to the Appeals Council from Dr. Sherman, who examined Febo in November 2011, and additional clinical findings from Dr. Clair.

"[N]ew evidence submitted to the Appeals Council following the ALJ's decision becomes part of the administrative record for judicial review when the Appeals Council denies review of the ALJ's decision." Perez v. Chater, 77 F.3d 41, 45 (2d Cir. 1996). The evidence must be (1) new; (2) material; and (3) it must relate to the period on or before the ALJ's decision. Id. Because the Commissioner's decision does not become final until after the Appeals Council denies review or issues its own findings, a final decision "necessarily includes the Appeals Council's conclusion that the ALJ's findings remained correct despite the new evidence." Id. (citing O'Dell v. Shalala, 44 F.3d 855, 859 (10th Cir. 1994)).

To the extent that Dr. Sherman and Dr. Clair include information relating to the period before the ALJ rendered a decision, which was on October 17, 2011, this information became part of the administrative record available to the Appeals Council for review. Indeed, the Appeals Council confirmed that it reviewed the additional evidence in its notice of its decision (R. 1.) When, as here, the Appeals Council denies review after considering new evidence, the Court "simply review[s] the entire administrative record, which includes the new evidence, and determine[s] . . . whether there is substantial evidence to support the decision of [the

Commissioner].” <u>Beach v. Comm'r of Soc. Sec.</u>, 11 Civ. 2089 (JMF), 2012 WL 3135621, at *11

(S.D.N.Y. Aug. 2, 2012), <u>appeal dismissed</u> (Dec. 6, 2012) (citing <u>Perez</u>, 77 F.3d at 46).

      Because the Court concludes that the ALJ committed legal errors in his application of the

treating physician rule and in his credibility determination, the Court does not reach the ultimate

question of whether the ALJ's decision that Febo is not disabled was supported by substantial

evidence. Accordingly, on remand, the Commissioner shall consider the records submitted from

Dr. Sherman and Dr. Clair as part of the administrative record. <u>See</u> <u>Jones v. Comm'r of Soc.</u>

<u>Sec.</u>, 12 Civ. 4815 (JPO)(JCF), 2013 WL 3486994, at *12, n.10 (S.D.N.Y. July 11, 2013).

### CONCLUSION

      For the foregoing reasons, the Court recommends that the Commissioner's motion for

judgment on the pleadings be DENIED, and plaintiff's cross motion for judgment on the

pleadings be GRANTED. The Court recommends REMAND to the Commissioner.

*     *     *

### NOTICE OF PROCEDURE FOR FILING OBJECTIONS TO THIS REPORT AND RECOMMENDATION

      The parties shall have fourteen days from the service of this Report and

Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of

the Federal Rules of Civil Procedure. <u>See also</u> Fed. R. Civ. P. 6(a), (d) (adding three additional

days when service is made under Fed. R. Civ. P. 5(b)(2)(C), (D), (E), or (F)). A party may

respond to another party's objections within fourteen days after being served with a copy. Fed.

R. Civ. P. 72(b)(2).  Such objections shall be filed with the Clerk of the Court, with courtesy

copies delivered to the chambers of the Honorable Paul A. Crotty at the United States

Courthouse, 500 Pearl Street, New York, New York 10007, and to any opposing parties. <u>See</u> 28

U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b). Any requests for an extension of time for

filing objections must be addressed to Judge Crotty. The failure to file these timely objections

will result in a waiver of those objections for the purposes of appeal. See 28 U.S.C. § 636(b)(1);

Fed. R. Civ. P. 6(a), 6(d), 72(b); Thomas v. Arn, 474 U.S. 140 (1985).

**SO ORDERED.**

_____
SARAH NETBURN
United States Magistrate Judge

New York, New York
September 4, 2013